[No. 5,977.—In Bank.]

## J. J. BRADY *v.* EARL BARTLETT ET AL

STREET ASSESSMENT—CONSTRUCTION OF STATUTE.—The provisions of § 26 of the Act of April 1st, 1872 (Stats. 1871-72, p. 822), concerning streets in San Francisco, requiring an entry of the due performance of a contract for street work, to be made in the record of the superintendent, are directory only, and a failure to comply with these provisions does not invalidate the assessment.

ID.—FRAUDULENT BID.—Under the act above referred to, the owner of property to be assessed for street improvement is entitled to have the work done by the lowest responsible bidder, upon a fair bidding, unaffected by any act, device, or machination of the bidder to whom the contract may be awarded, or any person in collusion with him. Accordingly, where it appeared that the successful bidder for a contract for street work had previously made a private contract with owners of the land to be assessed, that he would do the work at a specified rate in lieu of the rate to be awarded in the contract, *held*, that this was a fraud upon the other owners, and vitiated the assessment, and rendered it a nullity.

ID.—PLEADING.—*Held*, further, that this defense was admissible under the act referred to.

ID.— ID.—CASES EXPLAINED. — The cases of *Noland* v. *Reese*, 32 Cal. 486; *Chambers* v. *Satterlee*, 40 id. 513; *Himmelmann* v. *Hoadley*, 44 id. 224—were decided under other statutes which did not permit the defense above referred to, and the case of *Himmelmann* v. *Hoadley*, 44 Cal. 277, did not involve the point.

APPEAL from a judgment in favor of the defendants, in the Fourth District Court of the City and County of San Francisco. MORRISON, J.

The facts are stated in the opinion.

*C. H. Parker*, for Appellant, cited, upon the question of fraud, *Nolan* v. *Reese*, 32 Cal. 484; *Chambers* v. *Satterlee*, 40 id. 520; *Himmelmann* v. *Hoadley*, 44 id. 229; *S. C.* id. 277.

*Earl Bartlett*, for Respondents, on the same points, cited *Nolan* v. *Reese*, and *Hoadley* v. *Himmelmann*, cited *supra*, and Story's Eq. Jur. § 187; second K. C. 483 *m*; and upon the point first discussed by the Court, *Gately* v. *Irwin*, 51 Cal. 172; *Reis* v. *Graff*, 51 id. 86; *San Francisco* v. *Faton*, 46 id. 100.

THORNTON, J. :

This is an appeal from a judgment for defendants in an action brought to enforce the lien of a street assessment on a parcel of

land in the city and county of San Francisco. The Court rendered its decision, comprised in the following findings of fact and conclusions of law:

"This cause came on regularly to be heard before the Court sitting without a jury, on the 11th day of September, 1877, when the parties appeared by their respective counsel, ready for trial. A jury having been expressly waived, both parties produced documentary and oral evidence for and against the issues therein; and after argument by counsel the case was submitted to the Court, and after having fully considered the same, the Court finds the following facts:

"2. That the plaintiff, by competent evidence, established *prima facie* the facts alleged in the complaint in this action.

"1. That a petition to the Board of Supervisors of the city and county of San Francisco, to have that portion of Center (or Sixteenth) street lying between Potrero avenue and Nebraska street, crossing Utah street, and being two blocks in extent, graded and macadamized, was made and signed by three-fourths of the property owners in frontage fronting thereon, in November, 1872. That said petition embraced the work mentioned in the complaint in this action. That at the time of signing said petition one-half of the property owners fronting upon said portion of said street, that is, those between Utah street and Potrero avenue, entered into an agreement with one P. Donohue, a street contractor of said city and county, and the assignor of the plaintiff, by which he agreed to grade and macadamize said street in *front* of their property, at the price of $3\frac{1}{2}$ cents per square foot, and 12 cents per running foot for curbing the same. That in consequence of said agreement the said one-half owners signed said petition, and the same was presented to the Board of Supervisors of said city and county, in November, 1872; and in compliance therewith, said board passed a resolution of intention to have the said portion of said Center street described in said complaint graded and macadamized. That pursuant to such resolution, the subsequent proceedings were had, and the contracts for grading and macadamizing said portion of said street were awarded to said P. Donohue; and the superintendent of public streets, highways, and squares of said city and county, at the time, in pursuance of said award, entered

into said contracts with said Donohue for the grading and macadamizing said portion of said street at the following prices, to wit:

"For grading, 49½ cents per cubic yard; for macadamizing, 3½ cents per square foot; for curbing, 12 cents per running foot.

"That the assessment mentioned in said action is made out against all the property fronting on said work, at the prices stated in said contracts with said superintendent of streets; but those owners who entered into said agreement with said Donohue settled and paid for said work in front of their property, according to the prices fixed by said agreement. That the price for grading and macadamizing said portion of said street amounts to $4.67 per front foot, under the contracts with said superintendent of streets; but under said agreement with said portion of the property owners, is $1.93 cents per front foot. That said Donohue, at the time said agreement was entered into between him and said property owners, was a street contractor, and engaged in grading a street called Potrero avenue, in the vicinity of said work, and that said defendants did not sign said agreement or petition. That without these owners who entered into said agreement, there was not a majority of property owners in frontage who signed said petition. That said portion of said street had never been graded prior to said petition, neither had it been graded for two blocks on each side of said work.

"2. There is no entry in the record-books of the superintendent of public streets, highways, and squares of said city and county, signed by said superintendent or deputy, or otherwise, certifying that the work mentioned in said complaint has been performed and completed in accordance with the terms of the contract and specifications, as required by § 26 of the act concerning streets in the city and county of San Francisco, approved April 1st, 1872, and found in the Statutes of California for the year 1871–72, page 822. There is no entry whatever of the completion or acceptance of said work.

"3. That the defendant Bundy resided upon the premises described in said complaint, at the time said assessment was issued, and for more than ten days thereafter.

" As a conclusion of law, the Court finds that the assessment mentioned in said complaint is void, and there is no valid lien upon said premises for said work. Wherefore, judgment is hereby ordered to be entered for the defendants, with costs."

It is contended on behalf of appellant, the judgment is not supported by the facts found. On the contrary, that the facts found show that the judgment should have passed for the plaintiff. The respondents contend that the second finding of fact (which see above) supports the judgment; and to maintain this position, they rely on § 26 of the act concerning streets in the city and county of San Francisco, approved April 1st, 1872 (see Stats. of 1871–72, p. 804), and the decision of the Court in *Gately* v. *Irvine*, 51 Cal. 172.

By the section just mentioned (Stats. 1871–72, p. 822), it is provided that the superintendent of public streets, etc., and his deputies, shall take charge of and superintend all street work and improvements, and shall see that the contract made for doing such work is strictly fulfilled in every respect; and further, that it shall be the duty of the said superintendent, or one of his deputies, to enter upon the record-book, to be kept in the office of said superintendent for public inspection, entries under appropriate headings, showing how often, at what time, and by whom the work has been inspected, and in what manner the same is being performed; and on the completion of said work, and prior to the issuance of the assessment therefor, if the work has been performed and completed in accordance with the terms of the contract and specifications, an entry certifying to the same, signed by the superintendent, or one of his deputies who have had charge of and superintended the work performed.

Respondents urge, that the entries and certificate to be made, as required in the section just cited, are a prerequisite to the making of any assessment; and as there were none such made in this case, the assessment is invalid. Is this the proper interpretation of this section? In considering this question, reference must be had to other portions of the act, of which this section forms a part. Its meaning can only be arrived at by examining the entire act. (See Brown's Legal Maxims, 555, *ex antecedentibus*, etc.)

The chief officer to execute the provisions of the statute is the superintendent above mentioned. His duties are generally, in the matter of street improvements, called into action by the Board of Supervisors. The duties of the board are legislative or quasi-legislative; those of the superintendent, ministerial. It is unnecessary to take up time to point out those duties; four of them will be particularly stated. These duties will be found in the various sections of the Act of 1872. (See §§ 4, 6, 7, 8, 9, 10, 11, etc., p. 805, *et seq.* of Stats. of 1871–72.) An examination of these sections will show that the superintendent's powers and duties embrace the control and supervision of street work (see last clause but one of § 7), to some extent under the direction of the Board of Supervisors. He is to give notice of contemplated street work, and invite sealed proposals for doing it (§ 6); to specify the time in which the work is to be done, and furnish specifications of the work (§ 6), these specifications to be a part of the notice inviting proposals. (§ 16.) The board is, in open session, to open and examine these proposals, and award the contract to the lowest responsible bidder. (§ 6.) The superintendent is to enter into all written contracts, to fix the time for the commencement and completion of the work under all contracts entered into (§ 7), and extend the time as allowed by the act. (§§ 6 and 7.) He is then to make the assessment and apportionment of the expenses of such work (§ 8), after the contractor has fulfilled the contract to his (the superintendent's) satisfaction. (§ 9.) The section last referred to specifies the details of the assessment to be inserted in it by this officer. The assessment must briefly refer to the contract, the work contracted for and performed, allow the amount to be paid therefor, etc., the rate per front foot assessed, the amount of each assessment, the name of the owner of each lot or portion of lot, if known; if not known, to be signified by writing the word " unknown " opposite the number of the lot, the number of the lot, or such portion of the lot assessed, shall attach thereto a a diagram, exhibiting each street or street crossing, lane, alley, place, or court in which any work has been done, and showing the relative location of each distinct lot, or portion of lot, to the work done, numbered to correspond with the numbers in the assessment, and showing the number of feet frontage assessed

for such work contracted for and performed. (§ 9.) To this assessment he is to attach a warrant, signed by him, and countersigned by the auditor of said city and county. (§ 10.) It is made the duty of the officer last named, before countersigning the warrant, to examine the contract, the steps taken previous thereto, and the record of assessments, and he must be satisfied that the proceedings have been legal and fair. (§ 10.) The form of the warrant is given in full in this section. It is issued in the name of the superintendent, and is to contain the declaration, that, by virtue of the authority vested in him as superintendent, etc., he does, by such document, authorize and empower the contractor, his agent or assigns, to demand and receive the assessments upon the assessment and diagram attached, and the paper referred to shall be a warrant to do so. (§ 10.) The assessment, warrant, and diagram are then to be recorded in the office of the superintendent, *and when certified and so recorded, shall be a lien upon the lands, lots, or portions of lots assessed,* respectively, for the period of two years from the date of said recording, unless sooner discharged; and from and after the date of said recording of any warrant, assessment, and diagram, all persons mentioned in § 12 of the act (these persons are the *owner*, contractor, or his assigns), and all persons, whether named in the assessment or not, feeling aggrieved, etc. (see the section, p. 815), shall be deemed to have notice of the contents of the record thereof. After the papers above mentioned (warrant, assessment, and diagram) have been recorded, the same shall be delivered to the contractor, or his agent or assigns, on demand, etc.; and by virtue of the warrant, the contractor, or his agent or assigns, shall be authorized to demand and receive the amount of the several assessments made to cover the sum due for the work specified in the contract and assessment. (§ 10.) The contractor, or his assigns, or some person in his or their behalf, armed with the *papers-mentioned*, is then to make a demand as required by the provisions of the act (see § 11), return the warrant, if any sums are unpaid within ten days after its date, to the superintendent, with a verified return indorsed on the warrant, containing the essentials enumerated in the act. (§ 11.) An appeal is given to the Board of Supervisors, by § 12, to the owner, contractor, etc., and the right to sue by § 13.

It will be observed from these sections that the judgment of the superintendent of streets, whose duty it is to supervise all street work, and who is furnished with several deputies (§ 12) to enable him to discharge faithfully and fully the duties of his office, is called into exercise directly before the making of the assessment. He is to be *satisfied* that the contractor has *fulfilled his contract*, that the work has been well done and in compliance with the contract. (§ 9.) He gives bond and takes an oath to faithfully discharge the duties of his high and important office. Of the act in question it may be said, that in many of its provisions it is a jumble; but it is clear and beyond question that the duties above mentioned are required of him. A failure to perform them is infidelity to his trust. The law furnishes an adequate punishment for infidelity in this regard. This exaction of fidelity to duty is one of the safeguards to the property owner. The obligation imposed by law upon another officer, holding a position of dignity and responsibility, is called to the aid and supervision of the superintendent and the contractor, and thus another security is provided by law for the owner of property affected by the assessment. It is made the duty of the auditor of the city and county of San Francisco to countersign the warrant; but before doing so he is required "to *examine* the contract, the steps taken previous thereto, and the record of assessments, and (he) must be satisfied that the proceedings have been legal and fair." These obligations laid on the auditor are far-reaching and wide. It is not necessary here to define the scope of this obligation. It is enough to say that it is a broad one, and if faithfully performed, furnishes a strong security to the property owner. These obligations are imposed on the officers mentioned, in strong terms. There can be no mistake about them. No reading between the lines, no gloss or interpretation, can evade them. The judgments of those officers are to be put in writing, signed, and perpetuated in a record accessible to all. They remain in a public office, and all can see them. When these officers affix their signatures to the papers aforementioned, which they are by law required to sign, they utter and render their judgments upon the respective matters submitted to them by the law; viz., that the work has been done in accordance with the contract, that the assessment which charges the

lot owner should be made, that the contractor is entitled to it, and to all the rights and remedies which the law affords him. It may be added here, that, in case of error by these officers, remedies are furnished to the lot owner to correct them. If those remedies are inadequate, they must be supplied by further legislation. The courts cannot make them. They can only enforce those given by the law.

Now, in view of the provisions of the act under consideration, can the compliance by the officers mentioned in § 26, with its provisions, be regarded as essential to the validity of the assessment? It is conceded, that, in one point of view, it is mandatory to the officers whose duties are prescribed in it. A failure to comply with the provisions may be a neglect of official duty for which the superintendent may be responsible in a private action or public prosecution ; but does it follow, as a consequence of such neglect, that the validity of an assessment is impaired? As far as his official obligation extends, it may be conceded that it is mandatory. But as regards his duty to the contractor and the lot owner, is it not directory ?

If it is *essential* to the validity of the assessment, there can be no question that the assessment in this case is invalid, for it is expressly found that the provisions of § 26 were not complied with. (See second finding.)

"There is a known distinction," said Lord Mansfield, in *Rex* v. *Loxdale*, 1 Burr. 447, " between circumstances which are of the essence of a thing required to be done by an Act of Parliament, and clauses merely *directory*. The precise time in many cases is not of the essence." Our attention is here challenged to the rule, and an application of it is given. (*Shaw* v. *Randall* 15 Cal. 384; *Touhy* v. *Chase*, 30 id. 524; *People* v. *Lake County*, 33 id. 487.

The rule is thus stated by an able and learned author: " When statutes direct certain proceedings to be done in a certain way or at a certain time, and a strict compliance with these provisions of time and form does not appear essential to the judicial mind, the proceedings are held valid, though the command of the statute is disregarded or disobeyed. In these cases, by a somewhat singular use of language, the statute is said to be *directory*. In other cases, the statute is held to be *imperative* or

*mandatory.*" (Sedgwick on Stat. and Const. Law, 2d edition, with Pomrey's notes, p. 316, *et seq.*, and cases cited in notes. Observe criticism on word " directory," in note, *Harris* v. *Supervisors,* 52 Cal. 560.)

The rule is here stated with sufficient clearness. It is a rule of " *construction* or *interpretation,*" and under it, as under all such rules, arises what the author above cited call " questions of *application* " (p. 316). The rule is plain and simple, as are the rules of law generally; but to apply them, " *hoc opus est.*"

As a rule of construction or interpretation, we must, as in all such cases, seek to arrive at the *thought* of the Legislature. The thought points and indicates the intent. Many rules have been announced as aids to enable us to discover the thought and consequent intent of the law-making power. Of these rules, it may be said, as of all such rules, that they are to be used as servants, not as masters: as servants to assist in the search, not as masters to stop the search, or bind by an arbitrary decree. If implicit obedience to rules be yielded, which may in the particular cases where they are announced be properly and fittingly used and applied, it may be found that the rule, instead of leading to a proper solution, misleads and carries one astray from a right conclusion. (See remarks of Field, J., in *Ferris* v. *Coover,* 10 Cal. 628.)

It would be useless to spend time in stating these rules. Most of them may be found in Sedgwick on Statutory and Constitutional Law, edition above cited, and in the opinion of Dwinelle, J., inserted in the report of the case of *Harris* v. *Supervisors,* 52 Cal. 558.

The statute of 1872, in the sections preceding § 26, has provided, in our judgment, adequate securities to the lot owner as to the assessment in all its elements; and we cannot see why it is necessary to provide again, by § 26, additional securities on the same subject-matter, in the manner which its provisions prescribe. As to the essentials of these provisions, they have already been dealt with, and dealt with thoroughly, in the preceding sections. Every provision of this section has been already made substantially in the previous sections, except a showing as " to how often, at what time, and by whom the work has been inspected," and as to the manner in which the work

was performed while it is in process of execution; but the substantial results are all provided for; and as to the inspection of the work, it may be remarked that the law confers upon the superintendent the power to provide a deputy to inspect the work, and makes it his duty to inspect the work, and see that it has been inspected and properly performed; and it has never been held or supposed that a failure to have this done would vitiate the assessment.

We cannot perceive why it is necessary or essential to provide these securities to the property owner again by § 26, which have already been provided as strong as language can express them. But it is said that no record is required of many things of which by § 26 a record is ordered to be made, and to be made, too, by the superintendent or his deputies. How far is this correct? We have seen that several things are to be made matters of record by the superintendent. The contract (§ 11), warrant, assessment, and diagram (§ 10), the return on the warrant of the contractor, or his agent or assigns, with references showing the connection of those papers (§ 11), are to be recorded. This is to be done in books of record to be kept in the superintendent's office (§ 11), and all those records are during office hours to be open to the inspection of any citizen wishing to examine them, free of charge (§ 18). It is true, that there is no record required by any other section than *twenty-six* of "how often, at what time, and by whom the work has been inspected, and in what manner the work is being performed"; but we cannot see that this is essential to the assessment, since the work, if the officers do their duty (and we must presume that they have done so until the contrary is shown by some evidence), has been inspected in its progress; the work has been done, and the superintendent is bound to know by the other sections of the act, when he comes to exercise his judgment in making the assessment, in what manner the work has been performed. Why should these things be written down? If it is intended as a security to the property owner, it should have been more plainly expressed. The implication is not strong enough to indicate that the failure on the part of the officer was intended to render the assessment null. It would have been an easy matter to express such intent

by apt words, or an implication so plain and decided as to leave no room for doubt. It seems to us that a failure to comply with the provisions of this section would be of no more avail to show the assessment a nullity, than a failure in the officer to show in writing the several steps in the mental process by which he arrived at the conclusion that the contract had been complied with, the work done in accordance with its stipulations, and the contractor entitled to a warrant. The substantial end was reached by the official in the discharge of the duties imposed on him by the law, and this is as much a protection to all concerned as if the officer had set down in writing everything done by him in reaching a conclusion. Suppose the officer had written down all the steps by which he had proceeded to discharge his duties. What protection would it have been? Was it intended that courts or boards should scrutinize and criticise those various steps, and say that from them the officer had deduced the proper conclusion? This certainly could not have been allowed without an express mandate in the statute to that effect.

It may be said of the entry required in the last clause of the section (26) certifying that the work has been performed and completed in accordance with the terms of the contract and specification, and signed by the superintendent, or any of his deputies, who had had charge of and superintended the work performed, as was said of the other requirements of this section, that it had already been substantially required to be performed. This was done by the officer in adjudging the assessment due to the contractor, and issuing a warrant therefor. (§ 10, and particularly that portion of it just following the form of the warrant given.) In fact, the provisions of § 26 were made with an entirely different object. The intent of it was to have a record made, not for the protection of the owner especially or particularly, but "*for public inspection*" (as in the section stated), that every one, owner or contractor, or the mayor, or a supervisor, or other official or citizen who might desire to know what street work was going on, and what was the condition of such work in process of execution. The failure to do what is directed in the act may subject the officer to be proceeded against for a neglect of official duty (see Penal Code, § 772), but no such consequence is visited on the assessment as

making it null.  It would be a hard requirement upon the contractor to compel him to supervise the entries of the superintendent, and see that they were all performed as prescribed in § 26, in addition to the others we have noticed, and that a failure to insert in the record a diagram, or the name of the person who inspected the work on a particular day, should subject him to the loss of his labor and money, however faithfully and honestly the work performed or money expended.  If the officer fails to make the proper entry and certificate, must all proceedings stop, until the contractor or party aggrieved can apply for a *writ of mandate* to compel the performance of these duties? And if such application were made, would it not be a plain answer to it, that the record required was only to be made for the public generally, and that it was a matter of no concern to the contractor, more than to any other citizen?  Our conclusion is, that the failure to make the entry and certificate, as provided in the section mentioned, does not in any matter affect, as it is not essential to, the validity of the assessment.

It is urged, that this question has already been decided (*Gately* v. *Irvine*, 51 Cal. 172) adversely to the conclusion we have reached in this case.  It does not appear from the *opinion* in the case cited that the point was considered by the Court. The opinion is in these words: " We think the Court below was mistaken in supposing that the oral evidence rejected contradicted the record.  It only went to prove when the record was made."

But it is argued, that the Court must necessarily have considered and decided the question in the case cited.  The question presented for consideration by the Court in this case came thus before it.  The book of reports from the superintendent's office was offered in evidence, in an action to enforce an assessment for street work done in the city and county of San Francisco. This record appeared to be complete in all its parts, as required by § 26.  The defendant proposed to prove that the certificate to the report was not written or signed until October, 1874, after the assessment had been made.  The plaintiff objected to the offer, because the matter was irrelevant, and the Court sustained the objection.  The question to be decided was thus presented, and the Court disposed of it as we have seen.  It does not ap-

pear directly from the reported opinion that the Court considered the question of the relevancy of the evidence offered. But it is argued, with a deal of plausibility, that the question must have been considered and decided. It is said that the Court must have passed upon the relevancy of the offer, because if the excluded evidence was irrelevant, it was useless to pass on the point they did decide; that if the making of the record was unessential to the validity of the assessment, the evidence was irrelevant, and the Court would not have held the question of its admissibility immaterial and have approved the ruling of the Court *a quo*. *Ergo*, by holding it admissible, the Court held that it was irrelevant and fatal to the assessment.

Upon a careful consideration of the opinion in the case referred to, it is clear to us that the Court did not pass on the *relevancy* of the testimony excluded, but upon its *competency*.

The Court appears to have overlooked the real point of the objection, and to have decided on a point not made by counsel in the case. No objection of competency was made. Having disposed of the question as to the evidence by holding it competent, nothing further is said. For the foregoing reasons, we do not think the question before us was considered or decided by the Court in *Gately* v. *Irvine.*

But if it was considered and decided as contended for, we are of opinion, with unfeigned respect for the learning and judgments of our predecessors, that, as far as regards the question before us, such judgment would be outside of the lines of the law, and should not be regarded as a binding precedent.

We pass to the first finding. Does it support the judgment of the Court below ? It is urged, that this finding shows a fraud committed by the contractor, which vitiates the assessment, and therefore no judgment should be rendered sustaining it. The finding is briefly this: The Board of Supervisors, on a petition made in November, 1872, to have a portion of Center street, lying between Potrero avenue and Nebraska street, crossing Utah street, and being two blocks in extent, graded and macadamized, ordered the work to be done. The petition was made and signed by three-fourths of the property owners of the frontage affected. At the times of signing the petition, one-half of the owners of the property fronting on that portion of Center

street which extends from Potrero avenue to Utah street, entered into an agreement with one P. Donahue, who was then a street contractor in the city and county of San Francisco, and who is the assignor of plaintiff, by which it was stipulated that he (Donahue) should grade and macadamize Center street, in front of their property, at the price of three and a half cents per square foot, and twelve cents per running foot for curbing the same. In consequence of this agreement, half the owners just referred to signed the petition, which was filed, and the Board of Supervisors passed a resolution of intention to have the portion of Center street first above mentioned graded and macadamized. In pursuance of this resolution and the subsequent proceedings, the regularity of which is not attacked, the contracts for grading and macadamizing the street, as asked in the petition, were awarded to P. Donahue, and contracts were entered into with Donahue for doing the work; that is, for grading, at the sum of forty-nine and one-half cents per cubic yard; for macadamizing, three and one-half cents per square foot; for curbing, twelve cents per running foot. The assessment was made out at these prices against the whole frontage. The owners who entered into the agreement (we will call it a *side agreement*) with Donahue, paid for the work done in front of their property at the prices fixed in it. The price for grading and macadamizing under the contract amounts to $4.67 per front foot; under the side agreement, to $1.93 per front foot. The defendants did not sign the petition or side agreement. Without the owners who entered into the side agreement, there was not a majority of property owners in frontage who signed the petition. The portion of Center street ordered to be graded, etc., had never been graded prior to the petition, " neither had it been graded for two blocks on each side of said work."

The foregoing statement comprises all the facts found bearing on the contention between the parties as to the legal effect of this finding.

It will be observed, that the last clause in the finding is ambiguous, if taken literally and according to its grammatical construction. " It," as a question of correct syntax, in the sentence quoted above, from the finding, and designated by " *quotation marks*," refers to the portion of Center street in which the work

was to be done, and was done. But it is obvious that the intention was that this word should relate to Center street, and not to the portion of it above indicated. In construing any writing, the safer rule to adopt is to determine its meaning by the nature of the matter in it, and by the context, though it may violate grammatical rules. (*Ex parte Bollman,* 4 Cranch, 94; Broom's Legal Maxims, 652; *Maxim, Ad proximum antecedens,* etc.) We shall therefore treat it as referring to Center street.

Do the facts above stated, as found, show that the contractor Donahue committed a fraud of which the defendants can complain? The blocks on the Potrero are, in dimensions, four hundred by two hundred feet. The longer sides of the blocks are north and south. Center street runs east and west, Potrero avenue, Utah and Nebraska streets, crossing it at right angles. The short lines of the blocks front on Center street. Potrero avenue is one hundred feet in width; Utah and Nebraska streets are eighty feet wide. It will be observed, that it is not found whether the defendants, or either of them, knew, at the time the petition was filed with the Board of Supervisors, of the matters found to have been done by the contractor, which are alleged to be fraudulent. Nor is there any finding when they first became aware of them.

It is averred in the defense setting up the matters alleged to be fraudulent, that, owing to the side agreement, the defendants " were prevented from protesting against the said work, which they desired to do." As to these averments, which were in issue, nothing is found at all. If the issue on these allegations is material, that is, if the allegations are requisite to make out the defense, the failure to find on it is an error, for which the judgment should be reversed, and the cause remanded, that a finding may be had on it. (*Billings* v. *Everett,* 52 Cal. 661.) But it is strongly implied, by the averment above quoted, that the defendants were aware of the matters of alleged fraud in time to have protested against the work. If they were ignorant of them, how can it be truthfully said they were prevented from protesting? Webster, after giving two definitions of the verb " prevent " (1st, to go before; to precede; 2nd, to be beforehand with; to get the start of; to anticipate; to fore-

stall), which he says are *obsolete*, defines it to mean: "To intercept and stop; to hinder, to obstruct; to impede; to thwart." It cannot be said that one is hindered, or obstructed, or impeded, or thwarted, unless an effort is made to accomplish that which is hindered, or obstructed, or impeded, or thwarted. When such an effort is made, and it is defeated by the act of some person, it can then be said to be prevented. It may be conjectured or inferred that the machinations of a person would have defeated any effort to accomplish the end arrived at, but such an averment would lack the essential of a good pleading, unless it appeared clearly that the acts complained of could have no other result than to prevent.

But we cannot see how the defendants were prevented from protesting. The act complained of certainly put them under no duress, which would have stayed their hands in writing and signing and presenting a protest to the Board of Supervisors. If they did not know of the *so-called* fraudulent acts, did they, as found, constitute a fraud against the defendants?

Courts and authors have always been cautious in attempting a definition of fraud. (Story's Eq. Jur. § 186 ; *Twyne's Case,* 3 Coke, 80.) It does and can assume so many shapes, it is in this regard so protean in character, that judges and text writers have cautiously abstained from the dangerous entanglements of a definition. "*Omnis definitio in jure periculosa,*" is an old maxim, to which constant heed should be rendered. Definitions of *actual* or *constructive fraud* are given in the Civil Code, §§ 1572, 1573. These definitions are very broad, but whether they embrace every species of fraud, it would be impossible, *a priori,* to say.

Judge Story thus states the rule: "Fraud, indeed, in the sense of a court of equity, properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence justly reposed, and are injurious to another, or by which an undue or unconscientious advantage is taken of another. And courts of equity will not only interfere, in cases of fraud, to set aside acts done, but they will also, if acts have by fraud been prevented from being done by the parties, interfere, and treat the case exactly as if the acts had been done." (Story's Eq. Jur. § 187. See cases cited in

note.)    The definitions in the Code substantially accord with the rule above cited.

It is evident, from the foregoing rule, that fraud arises out of a breach of duty or obligation which one owes to another. Then if there is any fraud here, it must spring from the violation of a duty or obligation, which the contractor was under to the defendants. (Story's Eq. Jur. §§ 204, 208.)    What obligation or duty was due from the contractor to the defendants?

When the Board of Supervisors had authorized a street to be graded, by a resolution of intention, on a proper petition, of which resolution notice has been given by a proper publication, all owners of lands or lots or portions of lots, who may feel aggrieved or have objection to the ordering of the work described in the notice, or who may have objections to any subsequent proceedings of the board in relation to the work, or to any of the acts of the superintendent of streets, in the discharge of any of the duties or obligations imposed upon him by virtue of his office, may file with the clerk of the board a petition or remonstrance, wherein they shall set forth in what respect they feel aggrieved, or the acts or proceedings to which they object, which petition or remonstrance must be passed on by the board, and their decision shall be final and conclusive; but the board shall not order the said work to be done, unless all objections and protests that may have been presented to and filed with their clerk shall have been disposed of by it. (§ 4 of Act of April, 1872, Stats. of 1871–72, p. 805.)    The petition for grading must be signed by the owners or agents of the owners of a majority of the frontage of the lots fronting on the proposed work, or liable to be assessed for such grading. (§ 4.)    Should the owners or agents of more than one-half in frontage of the lots and lands fronting on the proposed work, or liable to be assessed therefor, file with the clerk of the board written objections against any grading described in the notice of intention, at any time before the expiration of the publication of the notice, the board is barred from proceeding further thereon for the period of six months, unless the owners or agents of a majority of the frontage of the lots fronting on the proposed work, or liable to be assessed therefor, shall petition anew for the work to be done. (§ 4.)    The board is authorized to award

contracts for grading and macadamizing, or either of such kinds of work, but before it awards any such contract, a notice is to be posted and published inviting sealed proposals for the contemplated work, for five days (§ 6), as has been set forth in a former part of this opinion.  Such proposals are to be delivered to the clerk of the board, and the board is required by the statute (§ 6), in open session, to open, examine, and publicly .declare the same, and to award the work to the lowest responsible bidder.  (§ 6.)

The contract is to be awarded to the lowest responsible bidder, except on a contingency which will be hereafter referred to.  And here the contractor, who is the lowest responsible bidder, to whom the contract is to be awarded, is first mentioned.  No trace of him is seen in the act until we reach this stage of the proceedings.  (§ 6.)  The notice of this award is to be published for three days (Sundays and non-judicial days excepted), and within five days after the first publication of the award, the owners of a majority of the frontage of the lots and lands liable to be assessed for the work may elect to do the work, and to enter into a written contract to do the whole work at the price for which it has been awarded, upon giving bond as provided in the act.  (§ 6.)

This is all we find in the act in force when the work involved in the case before us was ordered and done, that throws any light on the relations between the defendants (who were owners) and the contractor, existing in the incipiency of the contemplated work, and until it has progressed to the award of the contract.  The statute fails to recognize the contractor as connected with the petition for the work, or any proceeding regarding it, until he proffers a bid for it which is accepted. Even if he is owner of a lot fronting on the work, and liable to be assessed, he is regarded only as owner, and not as contractor.  Certain rights and privileges are recognized as existing in the owner, and confirmed to him by the provisions of the act.  But it is obviously the meaning and intent of the act, that each owner is to be protected to this extent, that he is entitled to have the work done by the lowest responsible bidder. The act certainly secures to him this measure of protection ; and he is entitled to have .this protection upon a fair and square

bidding, unaffected by any act, or device, or machination of the bidder to whom the contract may be awarded, or of any other person, whether owner or not, acting in collusion with such bidder.

If, now, the contractor, before the contract is awarded, combines and confederates with a portion of the owners, by which this purpose is defeated, is not this protection taken away from the owner? As in the case before us, by a collusive side agreement made with some of the owners, it resulted that the defendants were assessed for the work to the amount of $4.67 per front foot, and the owners who entered into the side agreement, *though assessed for a like amount*, were discharged on payment of $1.93 per front foot. The contractor and owners were willing that the work should be done, provided that the profit to the contractor should be made, not out of his friends who colluded with him, but out of those who did not sign the side agreement. It is too plain to elaborate it further, that the defendants, and each of them, were deprived of the right secured to them by the act of having the work done by the lowest responsible bidder, and that the devices of the contractor, and those who colluded with him, were a fraud on defendants, which vitiated the whole proceeding. The assessment has no foundation to it. It is vitiated with fraud from the beginning, and must be held to be a nullity.

Whether the defendants knew of the fraud or not in its inception and progress, whether they failed to protest or not, or to take any other step to put a stop to the proceeding, the result is the same. The fraud under any circumstances is fatal to the claims of the contractor, or his assignee, unless in some way condoned by the defendants. There is no condonation pretended in this case. The defense can be made under the 13th section of the Act of 1872. It arises under the third defense allowed by the section just above referred to. It was properly set up in this action. It follows, from the foregoing, that the judgment must be affirmed.

This conclusion is in harmony with what was said by Shafter, J., who drew up the opinion of the Court in *Nolan* v. *Reese*, 32 Cal. 486. In that case, an offer was made to prove what was pleaded and found here. The learned judge said, in

substance, to this offer: " Though the street contract in question was free from illegality in itself considered, still, assuming the facts which the defendant offered to prove, the side arrangements made by the contractor with a portion of the lot owners were in fraud of the method devised by the Legislature for the opening and repairing of streets, and the contract itself would, therefore, on the principles of the common law, be illegal and void from the beginning." The opinion then proceeds to state the reason why the ruling rejecting the offer should be upheld; viz., that the act on the subject then in existence did not admit such a defense. The remedies were narrowed to those adverted to in the opinion (see p. 487, 32 Cal.), and this meagerness of remedy was attributed to the necessities of the power given by the act. The decision was made under an act passed in 1862 (Stats. 1862, §§ 6; 12, p. 391), which allowed no such defense as that permitted by the Act of 1872. (See § 13.) This defense was first allowed by the Act of April 4th, 1870 (see § 7 of Act of 1870, Stats. of 1869–70, p. 895, amending § 3 of Act of March 26th, 1868), and was continued as a defense by the Act of 1872.

*Chambers* v. *Satterlee,* 40 Cal. 513, was decided under the Acts of 1862 and 1863. By neither of these acts was this defense allowed. (See 40 Cal. 520.) *Himmelmann* v. *Hoadley,* 44 Cal. 224, was decided under the same statutes as *Chambers* v. *Satterlee.* The case of *Himmelmann* v. *Hoadley,* 44 Cal. 277, did not involve this point at all.

The judgment is affirmed.

MORRISON, C. J., McKINSTRY, J., and ROSS, J., concurred in the judgment.

MYRICK, J., and SHARPSTEIN, J., dissented.